# SELF-INSURED SHORT TERM DISABILITY PLAN
## ADMINISTRATIVE SERVICES ONLY AGREEMENT

Calculation Arrangement with Checks

**Plan Sponsored By:**

Centene Management Company, LLC
7700 Forsyth Boulevard
Clayton, Missouri 63105

**Services Provided By:**

The Lincoln National Life Insurance Company

EXHIBIT
B

# ADMINISTRATIVE SERVICES ONLY AGREEMENT

This Agreement is entered into between **Centene Management Company, LLC** hereinafter referred to as the Sponsor, and The Lincoln National Life Insurance Company, hereinafter referred to as Lincoln, and is effective on the date specified in Part Six.

WHEREAS, the Sponsor has established a self-insured Short Term Disability Plan, hereinafter called the Plan, which is outlined in the Plan Description attached to this Agreement as Annex A; and

WHEREAS, the Sponsor has requested Lincoln to furnish the services described in Annex B attached to this Agreement, hereinafter referred to as the Services, with respect to the Plan;

NOW THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, the Sponsor and Lincoln agree as follows:

## Part One. GENERAL PROVISIONS

A. Final authority and responsibility for the Plan and its operation are vested in the Sponsor, and Lincoln is empowered to act on behalf of the Sponsor for the Plan only as expressly stated in this Agreement or as mutually agreed in writing by Lincoln and the Sponsor.

B. It is understood that the legal and tax status of the Plan under applicable law are matters for the Sponsor's determination, and that Lincoln bears no such responsibility. It is further understood that Lincoln is neither the Administrator, a Fiduciary nor a named Fiduciary of the Plan for purposes of the Employee Retirement Income Security Act of 1974 or any state law of a similar nature.

## Part Two. LINCOLN'S OBLIGATIONS

A. On behalf of the Sponsor, Lincoln will perform the Services described in Annex B in connection with the Plan.

B. On the dates specified in Annex C, Lincoln will report to the Sponsor the amount of the charges for the Services performed since the date of the last report.

C. Lincoln will furnish other reports, as requested by the Sponsor and agreed to in writing by Lincoln, regarding this Agreement.

D. Lincoln will maintain a copy of all records used in the performance of any Service for the ten (10) years following the calendar year in which the Service was performed. Thereafter, or in the event of this Agreement's earlier termination, at the Sponsor's request, Lincoln will prepare a summary of recommended claims activity for the last 12 months. The Sponsor, after giving Lincoln 30 business days' written notice, may review and audit any such records in Lincoln's possession at any time during Lincoln's normal business hours. All claims records are the property of the Sponsor and will be returned to the Sponsor after the termination of this Agreement.

E. Lincoln will indemnify and hold harmless the Sponsor and its directors, officers and employees from any claims, lawsuits, settlements, judgments, costs, penalties and expenses, including but not limited to attorneys' fees if it is determined that any such liability was the direct consequence of criminal conduct, gross negligence or fraud on Lincoln's part or any of its directors, officers or employees, provided however that in no event shall Lincoln be liable for the payment of Plan benefits from its own funds. The Sponsor shall provide prompt and written notice to Lincoln and consult with Lincoln with respect to any liability for which it claims indemnity under this provision.

   Failure to respond within 60 days of receipt of notice of claim for indemnification under this provision shall constitute an absolute admission of liability for the claim to which the notice related.

## ADMINISTRATIVE SERVICES ONLY AGREEMENT
(Continued)

F. Lincoln shall not disclose or use any non-public personally identifiable claimant information except for purposes of carrying out this Agreement, pursuant to an authorization, or as required or permitted by applicable state or federal law or regulation governing the use or disclosure of medical records and non-public personally identifiable information, including any state or federal laws pertaining to the confidentiality of medical records that include diagnosis and treatment for HIV and psychiatric or substance abuse conditions and problems. "Non-public personally identifiable information" is financial or medical information of or concerning a claimant which either has been obtained from sources which are not available to the general public or obtained from the person who is the subject of the information.

**Part Three. THE SPONSOR'S OBLIGATIONS**

A. The Sponsor will:
1. furnish any information specifically required in Annex B;
2. establish and maintain such accounts and records, assume such responsibilities and perform such functions required in that Annex; and
3. furnish to Lincoln any other information that Lincoln may require to provide the Services.

B. Lincoln will not be considered to have failed to perform its obligations under this Agreement if any delay or non-performance on its part is due, in whole or in part, to the Sponsor's failure to discharge its own obligations promptly.

C. The Sponsor will provide Lincoln with the names of individuals authorized to act for the Sponsor in connection with this Agreement, together with a statement regarding the extent of their authority.

D. The Sponsor will indemnify and hold harmless Lincoln and its directors, officers and employees from any claims, lawsuits, settlements, judgments, costs, penalties and expenses, including but not limited to attorneys' fees resulting from or arising out of or in connection with any function of Lincoln under this Agreement, unless it is determined that the liability was the direct consequence of criminal conduct, gross negligence or fraud on Lincoln's part or any of its directors, officers or employees. Lincoln shall provide prompt and written notice to the Sponsor and consult with the Sponsor with respect to any liability for which it claims indemnity under this provision.

Failure to respond within 60 days of receipt of notice of claim for indemnification under this provision shall constitute an absolute admission of liability for the claim to which the notice related.

E. When applicable, the Sponsor will reimburse Lincoln for any premium taxes or similar gross receipts taxes attributable to this Agreement, any related interest, fines or penalty charges, and any expenses incurred in reasonable legal efforts to avoid tax liability, whether successful or not. Lincoln will make reasonable legal efforts to avoid liability for any such taxes, interest, or penalties. But Lincoln need not make any such efforts, after consulting with the Sponsor, which in Lincoln's best reasonable judgment are unwarranted in view of any of the following conditions:

1. the prospects for success,
2. the amounts at stake,
3. the number of taxable years affected,
4. the value of the case as a precedent,
5. the time and expense involved, or
6. the potential effects on Lincoln's other business.

Reimbursement will be paid by the Sponsor within 30 days of Lincoln's notification.

## ADMINISTRATIVE SERVICES ONLY AGREEMENT
(Continued)

**Part Four. CHARGES FOR THE SERVICES**

A. Charges for Services will be according to the Schedule of Charges described in Annex C attached to this Agreement. Charges will be payable to Lincoln by the Sponsor within 45 days after each date on which Lincoln notifies the Sponsor of the amount of the charges for the Services performed. Lincoln will bill the Sponsor directly for its charges for the Services.

B. Lincoln will not change the rates set forth in Annex C, "Administrative Service Only Charges", within the first 36 months of this Agreement, except that Lincoln may change rates upon giving at least 31 days prior written notice of such change, at any time during the first 36 months if any of the following events occur:

1. the number of participants changes by 20%; or
2. the Sponsor materially modifies the terms of its Plan; or
3. the Sponsor requests that Lincoln provide additional Services that materially impact the cost or operational burden of performing the Services.

After the first 36 months Lincoln may change the rates set forth in Annex C, "Administrative Service Charges", upon giving at least 31 days prior written notice of such change. No such changes will be made more often than once during any 12-month period that this Agreement is in effect. Such change will become effective on the date Lincoln designates, and will form a part of this Agreement.

**Part Five. TERMINATION OF AGREEMENT**

A. This Agreement may be terminated by the mutual agreement of both parties or by one party upon 30 days advance written notice to the other party. Alternatively, this Agreement will terminate on the earliest of:

1. the date specified in a written notice Lincoln provides to the Sponsor of Lincoln's intent to terminate this Agreement because of the Sponsor's failure to remit to Lincoln charges for Services within 45 days from the date they were due.

2. the date specified in a written notice Lincoln provides to the Sponsor of Lincoln's intent to terminate this Agreement because any state or other jurisdiction enacts a law or interprets existing law in a manner which Lincoln has determined, upon the advice of its counsel, will prohibit the continuance of this Agreement;

3. termination of the Plan;

4. modification of the Plan. However, the modification will not have the effect of terminating this Agreement:

   a. if this Agreement is changed to make the modified plan the Plan under this Agreement; or
   b. while this Agreement is being continued, by mutual agreement between Lincoln and the Sponsor, in anticipation of such a change.

5. the date specified in a written notice given by Lincoln to the Sponsor of Lincoln's intent to terminate this Agreement because of the Sponsor's failure to reimburse Lincoln for any benefit payments that Lincoln may make in good faith on the Sponsor's behalf, within 24 hours of receipt of the Funding Report.

B. In the event that this Agreement terminates, Lincoln will stop furnishing claims management Services at 12:01 A.M. on the termination date. Lincoln will continue to provide services with respect to open and active claims that are under Lincoln's management prior to the termination date of this Agreement. All provisions of this Agreement will continue in effect with respect to such services.

C. The rights and duties contained in any indemnification and/or hold harmless provisions of this Agreement will survive its termination.

**Part Six. MISCELLANEOUS PROVISIONS**

A. This Agreement includes all attached Annexes, and may be changed by an amendment signed by the Sponsor and a Lincoln officer.

No term or provision of this Agreement will be waived and no breach will be excused, unless the waiver or consent is signed by the party claimed to have waived or given consent.

B. The parties to this Agreement will promptly advise each other in writing of any potential or actual legal or regulatory proceedings concerning the Plan or the activities of either party with respect to the Plan. Furthermore, the parties agree to cooperate with each other about potential or actual legal or regulatory proceedings.

C. Any of the functions to be performed by Lincoln under this Agreement may be performed by Lincoln or any of its subsidiaries, affiliates, or parent companies, or any independent entity with whom Lincoln contracts. The references in Subpart Three. D and Three. E of the Agreement and l.A.2 of Annex B to Lincoln, its directors, officers and employees, will also include such parent, affiliate or subsidiary, its directors, officers, and employees and such independent entity.

D. The Sponsor authorizes Lincoln to communicate to any reinsurer, with whom the Sponsor may contract for excess coverage, such timely information concerning the Sponsor's operations and loss experience as the reinsurer may require.

E. Notwithstanding any other provision to the contrary, Lincoln will have sole discretion in determining whether any claim or suit, arising by reason of any liability or alleged liability of Lincoln in connection with the performance of any of its functions under this Agreement, will be paid, compromised, litigated or appealed, and Lincoln will also have sole discretion regarding all matters of procedure and defense for any such claim or suit.

## ADMINISTRATIVE SERVICES ONLY AGREEMENT
(Continued)

F. While this Agreement is in effect and within one (1) year after its termination, Lincoln, after giving the Sponsor 30 business days' written notice, may audit the Sponsor's, and any affiliated employer's books and records which are relevant to this Agreement.

G. This Agreement shall be governed by applicable federal law and by the laws of the Commonwealth of Massachusetts.

H. The effective date of this Agreement is: **July 01, 2018**

The number of this Agreement is: **PD3-840-445197-01**

IN WITNESS WHEREOF, Lincoln and the Sponsor have caused this Agreement to be executed in duplicate by their respective officers duly authorized to do so.

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY

Nancy Goodwin

Sr. Vice President, LMB Underwriting

# ANNEX A
# of
# ADMINISTRATIVE SERVICES ONLY AGREEMENT

## BENEFIT DESCRIPTION

Centene Management Company, LLC Short Term Disability Plan is self-funded. The Lincoln National Life Insurance Company provides claim administrative services. The Sponsor retains the authority to render all final claim decisions. The Sponsor agrees to pay the benefits provided by this Plan in accordance with its provisions. The Sponsor's Short Term Disability Plan is governed by the Employee Retirement Income Security Act (ERISA).

PLEASE READ THIS PLAN CAREFULLY FOR FULL DETAILS.

# Centene Management Company, LLC Short Term Disability Plan Summary

**April 13, 2023**

The information contained in this document is merely a compilation of the Company's short-term disability Plan provisions for use in administering claims and is not intended to be a Plan document on which a participant may rely for benefits. The Company has reviewed and approved the summary of the Plan's provisions contained herein. The Company is the Plan Fiduciary.

The Plan provides short term disability (STD) benefits to eligible participants under the terms and conditions of the Plan . The Plan is a self-funded welfare benefit Plan (Plan). The Plan is administered by Centene Management Company, LLC (Company).

The Lincoln National Life Insurance Company (together with its affiliates and subsidiaries, "Lincoln") (Lincoln) provides non-fiduciary claim processing services to the Plan. The Plan is not insured by Lincoln, and Lincoln has not issued any insurance policy that would fund benefits under the Plan. Lincoln is not responsible to fund the payment of any benefits under the Plan.

This document provides a summarized explanation of the Plan benefits in effect as of the date on the front page of this document. The master Plan , if any, more fully describes the terms and conditions of the Plan. If the terms of this document and the master Plan differ, the master Plan will govern. A complete copy of the master Plan, if any, is in the possession of the Company and is available for your review upon request. In the event of any changes in benefits or Plan provisions, the Company will provide you a new summary Plan description, a statement of material modification, or a supplement that describes any changes.

Possession of this document does not necessarily mean you are a participant under the Plan. This document explains the requirements for becoming a participant under the Plan. The dates on which participation begins or ceases are explained within this document. The description of Eligible Classes, as that term is defined in this document, will help you determine what benefits, if any, may apply to you.

For information, contact Centene Management Company, LLC.

THE PLAN MAY BE AMENDED OR TERMINATED BY Centene Management Company, LLC AT ANY TIME AND FOR ANY REASON.

# SECTION 1 - PLAN SPECIFICATIONS

## ELIGIBILITY REQUIREMENTS FOR PARTICIPATION

**Minimum Hourly Requirement:**

Employees working a minimum of 30 regularly scheduled hours per week

**Short Term Disability Benefits:**

Class 1: All Active, full-time Employees excluding Employees classified as PRN, per diem, project workers, interns, and contingent

**Note:** This policy does not cover the following Employees: Temporary and Seasonal Employees, and Employees who are not legal residents working in the United States.

**Eligibility Waiting Period:**

1. If the Employee is employed by the Company on the Plan effective date -
   First of the month following 90 days of continuous, Active Employment

2. If the Employee begins employment for the Company after the Plan effective date -
   First of the month following 90 days of continuous, Active Employment

**Employee Contributions Required:**

No

**Name of Associated Companies**

Centene Company of Texas
7700 Forsyth Blvd
St. Louis, MO 63105 USA

Health Net of California, Inc.
7700 Forsyth Blvd
St. Louis, MO 63105 USA

MHS Travel & Charter
7700 Forsyth Blvd
St. Louis, MO 63105 USA

Managed Health Network
7700 Forsyth Blvd
St. Louis, MO 63105 USA

Health Net Federal Services, LLC
7700 Forsyth Blvd
St. Louis, MO 63105 USA

MHN Services LLC
7700 Forsyth Blvd
St. Louis, MO 63105 USA

Effective: July 10, 2020
Comprehensive Health
Management, Inc.
770 Forsyth Blvd
Clayton, MO 63105 USA

**Elimination Period:**

The period for which a benefit is payable will commence following the Elimination Period shown below:

7 calendar days for Injury
7 calendar days for Sickness

**Note:** Benefits will begin on the first day following the completion of the Elimination Period.

**Amount of Benefits**

60.00% of Basic Weekly Earnings less Other Income Benefits and Other Income Earnings.

With regard to the birth of a child:

Weeks 1 - 8 in which a benefit is payable following delivery: 100% of Basic Weekly Earnings less Other Income Benefits and Other Income Earnings.

Weeks 9 - 25 in which a benefit is payable following delivery: 60% of Basic Weekly Earnings less Other Income Benefits and Other Income Earnings.

**Maximum Benefit Period:**

**Applicable to Injury:**

The period for which a benefit is payable, following completion of the Elimination Period, for any one Disability will end on the earliest of:

a. the end of the Disability; or

b. the end of the 25th week of Disability for which a benefit is payable.

**Applicable to Sickness:**

The period for which a benefit is payable, following completion of the Elimination Period, for any one Disability will end on the earliest of:

a. the end of the Disability; or

b. the end of the 25th week of Disability for which a benefit is payable.

## SECTION 2 - DEFINITIONS

In this section the Company defines some basic terms needed to understand this Plan. The male pronoun whenever used in this Plan includes the female.

**"Active Employment"** means the Employee must be actively at work for the Company:

1. on a full-time basis and paid regular earnings;

2. for at least the minimum number of hours shown in the Plan Specifications; and either perform such work:

   a. at the Company's usual place of business; or
   b. at a location to which the Company's business requires the Employee to travel.

An Employee will be considered actively at work if he was actually at work on the day immediately preceding:

1. a weekend (except where one or both of these days are scheduled work days);
2. holidays (except when the holiday is a scheduled work day);
3. paid vacations;
4. any non-scheduled work day;
5. an excused leave of absence (except medical leave for the Employee's own disabling condition and lay-off); and
6. an emergency leave of absence (except emergency medical leave for the Employee's own disabling condition).

**"Appropriate Available Treatment"** means care or services which are:

1. generally acknowledged by Physicians to cure, correct, limit, treat or manage the disabling condition;
2. accessible within the Employee's geographical region;
3. provided by a Physician who is licensed and qualified in a discipline suitable to treat the disabling Injury or Sickness;
4. in accordance with generally accepted medical standards of practice.

**"Basic Weekly Earnings"** means the Employee's Annual Benefits Base Rate, which is comprised of his weekly rate of earnings from the Company in effect immediately prior to the date Disability or Partial Disability begins. However, such earnings will not include bonuses, overtime pay and extra compensation other than commissions. Commissions will be averaged over the 12 calendar months as of the September 1st immediately prior to the date Disability or Partial Disability begins or the period of employment if employed less than 12 months.

**"Disability"** or **"Disabled"** means the Employee, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Job.

**"Eligibility Date"** means the date an Employee becomes eligible to participate in this plan. Eligibility Requirements are shown in the Plan Specifications.

**"Eligibility Waiting Period"** means the continuous length of time an Employee must be in Active Employment in an eligible class to reach his Eligibility Date.

**"Elimination Period"** means a period of consecutive days of Disability for which no benefit is payable. The Elimination Period is shown in the Plan Specifications and begins on the first day of Disability.

**"Employee"** means a person in Active Employment with the Company who is participating in this Plan.

**"Enrollment Form"** is the document completed by the Employee, if required, when enrolling to participate in the Plan. This form must be satisfactory to the Company or its agent.

**"Family and Medical Leave"** means a leave of absence for the birth, adoption or foster care of a child, or for the care of the Employee's child, spouse or parent or for the Employee's own serious health condition as those terms are defined by the Federal Family and Medical Leave Act of 1993 (FMLA) and any amendments, or by applicable state law.

**"Gross Weekly Benefit"** means the Employee's Weekly Benefit before any reduction for Other Income Benefits and Other Income Earnings.

**"Hospital"** or **"Institution"** means a facility licensed to provide Treatment for the condition causing the Employee's Disability.

**"Initial Enrollment Period"** means one of the following periods during which an Employee may first enroll to participate in this Plan:

1. for an Employee who is eligible on the Plan effective date, a period before the Plan effective date set by the Company.

2. for an Employee who becomes eligible after the Plan effective date, the period which ends 31 days after his Eligibility Date.

**"Injury"** means bodily impairment resulting directly from an accident and independently of all other causes. For the purpose of determining benefits under this Plan:

1. any Disability which begins more than 60 days after an Injury will be considered a Sickness; and

2. any Injury which occurs before the Employee is a particiant under this Plan, but which accounts for a medical condition that arises while the Employee is participating in this Plan will be treated as a Sickness.

**"Material and Substantial Duties"** means responsibilities that are normally required to perform the Employee's Own Job and cannot be reasonably eliminated or modified.

**"Own Job"** means the Employee's job that he was performing when his Disability or Partial Disability began.

**"Partial Disability" or "Partially Disabled"** means the Employee, as a result of Injury or Sickness, is able to:

1. perform one or more, but not all, of the Material and Substantial Duties of his Own Job or another job on an Active Employment or a part-time basis; or

2. perform all of the Material and Substantial Duties of his Own Job or another job on a part-time basis; and

3. earn between 20.00% and 80.00% of his Basic Weekly Earnings.

**"Physician"** means a person who:

1. is licensed to practice medicine and is practicing within the terms of his license; or

2. is a licensed practitioner of the healing arts in a category specifically favored under the health coverage laws of the state where the Treatment is received and is practicing within the terms of his license.

It does not include an Employee, any family member or domestic partner.

**"Plan Specifications"** means the section of this plan which shows, among other things, the Eligibility Requirements, Eligibility Waiting Period, Elimination Period, Amount of Benefits, Minimum Benefit, and Maximum Benefit Period.

**"Proof"** means the evidence in support of a claim for benefits and includes, but is not limited to, the following:

1. a claim form completed and signed (or otherwise formally submitted) by the Employee claiming benefits;

2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Employee's attending Physician; and

3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

Proof must be submitted in a satisfactory form or format.

**"Regular Attendance"** means the Employee's personal visits to a Physician which are medically necessary according to generally accepted medical standards to effectively manage and treat the Employee's Disability or Partial Disability.

**"Sickness"** means illness, disease, pregnancy or complications of pregnancy.

**"Treatment"** means consulting, receiving care or services provided by or under the direction of a Physician including diagnostic measures, being prescribed drugs and/or medicines, whether the Employee chooses to take them or not, and taking drugs and/or medicines.

**"Weekly Benefit"** means the weekly amount payable by the Plan to the Disabled or Partially Disabled Employee.

## SECTION 3 - ELIGIBILITY

**Eligibility Requirements**

The eligibility requirements for participation are shown in the Plan Specifications.

**Eligibility Date**

An Employee in an eligible class will qualify to participate on the later of:

1. this Plan's effective date; or

2. the day after the Employee completes the Eligibility Waiting Period shown in the Plan Specifications.

**Family and Medical Leave**

An Employee's participation may be continued under this Plan for an approved family or medical leave of absence for up to 12 weeks following the date participation would have terminated, subject to the following:

1. the authorized leave is in writing;

2. the required contribution is made;

3. the Employee's benefit level, or the amount of earnings upon which the Employee's benefit may be based, will be that in effect on the date before said leave begins; and

4. continuation of participation will cease immediately if any one of the following events should occur:

    a. the Employee returns to work;
    b. this group benefit Plan terminates;
    c. the Employee is no longer in an eligible class;
    d. fails to make the required contribution when due to the Company;
    e. the Employee's employment terminates.

**Associated Companies**

Companies, corporations, firms or individuals that are subsidiary to, or affiliated with, the Sponsor will be called Associated Companies. The Associated Companies, if any, are listed in the Plan Specifications. Employees of Associated Companies will be considered Employees of the Company for purposes of this Plan.

As they relate to this Plan, all actions, agreements and notices between Lincoln and the Company will be binding on the Associated Companies.

If any Associated Companies cease to be Associated Companies for any reason, its Employees will be deemed to have transferred to a class of Employees not eligible for participation under this Plan.

## SECTION 4 - DISABILITY INCOME BENEFITS

**Disability Benefit**

When the Plan receives Proof that an Employee is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, he may be eligible to receive a Weekly Benefit after the end of the Elimination Period, subject to any other provisions of this Plan. The benefit will be paid for the period of Disability if the Employee gives to the Plan Proof of continued:

1. Disability;
2. Regular Attendance of a Physician; and
3. Appropriate Available Treatment.

The Proof must be given upon the Plan's request and at the Employee's expense. In determining whether the Employee is Disabled, the Plan will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Disability, the Injury must occur and Disability must begin while the Employee is a participant of this Plan.

The Weekly Benefit will not:

1. exceed the Employee's Amount of Benefits; or
2. be paid for longer than the Maximum Benefit Period.

The Amount of Benefits and the Maximum Benefit Period are shown in the Plan Specifications.

**Amount of Disability Weekly Benefit**

To figure the amount of Weekly Benefit:

1. Take the lesser of:
    a. the Employee's Basic Weekly Earnings multiplied by the benefit percentage shown in the Plan Specifications; or
    b. the Maximum Weekly Benefit shown in the Plan Specifications; and then
2. Deduct Other Income Benefits and Other Income Earnings, (shown in the Other Income Benefits and Other Income Earnings provision of this Plan), from this amount.

**Partial Disability**

When the Plan receives Proof that an Employee is Partially Disabled and has experienced a loss of earnings due to Injury or Sickness and requires the Regular Attendance of a Physician, he may be eligible to receive a Weekly Benefit, subject to any other provisions of this Plan . To be eligible to receive Partial Disability benefits, the Employee may be employed in his Own Job or another job, must satisfy the Elimination Period, and must be earning between 20.00% and 80.00% of his Basic Weekly Earnings.

A Weekly Benefit will be paid for the period of Partial Disability if the Employee gives to the Plan Proof of continued:

1. Partial Disability;

2. Regular Attendance of a Physician; and

3. Appropriate Available Treatment.

The Proof must be given upon the Plan's request and at the Employee's expense. In determining whether the Employee is Partially Disabled, the Plan will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Partial Disability, the Injury must occur and Partial Disability must begin while the Employee is a participant of this Plan.

**Loss of Earnings Weekly Calculation**

The Weekly Benefit will be calculated as follows:

1. Subtract the Employee's earnings received while he is Partially Disabled from his Basic Weekly Earnings. This figure represents the amount of lost earnings.

2. Multiply the amount of lost earnings by 75%; and then

3. deduct Other Income Benefits (shown in the Other Income Benefits and Other Income Earnings provision of this Plan) from this amount.

The Weekly Benefit payable will not be more than the Disability benefit otherwise payable under this Plan.

**Other Income Benefits and Other Income Earnings**

**Other Income Benefits** means:

1. The amount for which the Employee is eligible under:

    a. any work loss provision in mandatory "No-Fault" auto coverage; or

    b. any governmental program or coverage required or provided by statute (including any amount attributable to the Employee's family).

2. any amount the Employee receives from any unemployment benefits; or

3. any amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar Plan or act, which:

    a. the Employee receives or is eligible to receive; and
    b. his spouse, child or children receives or are eligible to receive because of his Disability; or
    c. his spouse, child or children receives or are eligible to receive because of his eligibility for Retirement Benefits.

**Other Income Earnings** means:

1. any amount the Employee receives from any formal or informal sick leave or salary continuation Plan(s); and

2. the amount of earnings the Employee earns or receives from any form of employment excluding severance.

Other Income Benefits, except Retirement Benefits, must be payable as a result of the same Disability for which the Company pays a benefit. The sum of Other Income Benefits and Other Income Earnings will be deducted in accordance with the provisions of this Plan.

**Estimation of Benefits**

The Employee's Disability or Partial Disability benefits will be reduced by the amount of Other Income Benefits that the Plan estimates is payable to the Employee and his dependents.

The Employee's Disability benefit will not be reduced by the estimated amount of Other Income Benefits if the Employee:

1. provides satisfactory proof of application for Other Income Benefits;

2. signs a reimbursement agreement under which, in part, the Employee agrees to repay the Plan for any overpayment resulting from the award or receipt of Other Income Benefits;

3. if applicable, provides satisfactory proof that all appeals for Other Income Benefits have been made on a timely basis to the highest administrative level unless the Plan determines that further appeals are not likely to succeed; and

4. if applicable, submits satisfactory proof that Other Income Benefits have been denied at the highest administrative level unless the Plan determines that further appeals are not likely to succeed.

In the event that the Plan overestimates the amount payable to the Employee from any Plans referred to in the Other Income Benefits and Other Income Earnings provision of this Plan, the Plan will reimburse the Employee for such amount upon receipt of written proof of the amount of Other Income Benefits awarded (whether by compromise, settlement, award or judgement) or denied (after appeal through the highest administrative level).

**Lump Sum Payments**

Other Income Benefits from a compromise, settlement, award or judgement which are paid to the Employee in a lump sum and meant to compensate the Employee for any one or more of the following:

1. loss of past or future wages;
2. impaired earnings capacity;
3. lessened ability to compete in the open labor market;
4. any degree of permanent impairment; and
5. any degree of loss of bodily function or capacity;

will be prorated on a weekly basis as follows:

1. over the period of time such benefits would have been paid if not in a lump sum; or

2. if such period of time cannot be determined, over a period of 260 weeks.

**Prorated Benefits**

For any period for which a Short Term Disability benefit is payable that does not extend through a full week, the benefit will be paid on a prorated basis. The rate will be 1/5th for each day for such period of Disability.

**Discontinuation of the Short Term Disability Benefit**

The Weekly Benefit will cease on the earliest of:

1. the date the Employee fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;

2. the date the Employee fails to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

3. the date the Employee refuses to be examined or evaluated at reasonable intervals;

4. the date the Employee refuses to receive Appropriate Available Treatment;

5. the date the Employee refuses a job with the Company where workplace modifications or accommodations were made to allow the Employee to perform the Material and Substantial Duties of the job;

6. the date the Employee is able to work in his Own Job on a part-time basis, but chooses not to;

7. the date the Employee's current Partial Disability earnings exceed 80.00% of his Basic Weekly Earnings;

   Because the Employee's current earnings may fluctuate, earnings will be averaged over three consecutive weeks rather than immediately terminating his benefit once 80.00% of Basic Weekly Earnings has been exceeded.

8. the date the Employee is no longer Disabled according to this Plan;

9. the end of the Maximum Benefit Period; or

10. the date the Employee dies.

**Successive Periods of Disability**

With respect to this Plan, "**Successive Periods of Disability**" means a Disability which is related or due to the same cause(s) as a prior Disability for which a Weekly Benefit was payable.

A Successive Period of Disability will be treated as part of the prior Disability if, after receiving Disability benefits under this Plan, an Employee:

1. returns to his Own Job on an Active Employment basis for less than fourteen continuous days; and

2. performs all the Material and Substantial duties of his Own Job.

To qualify for the Successive Periods of Disability benefit, the Employee must experience more than a 20% loss of Basic Weekly Earnings.

Benefit payments will be subject to the terms of this Plan for the prior Disability.

If an Employee returns to his Own Job on an Active Employment basis for fourteen continuous days or more, the Successive Period of Disability will be treated as a new period of Disability. The Employee must complete another Elimination Period.

If an Employee becomes eligible for benefits under any other group short term disability Plan, this Successive Periods of Disability provision will cease to apply to that Employee.

# SECTION 5 - EXCLUSIONS

## GENERAL EXCLUSIONS

This Plan will not provide benefits for any Disability due to:

1. war, declared or undeclared, or any act of war;
2. intentionally self-inflicted injuries, while sane or insane;
3. active Participation in a Riot;
4. the committing of or attempting to commit an indictable offense;
5. cosmetic surgery unless such surgery is in connection with an Injury or Sickness sustained while the individual is an Employee;

No benefit will be payable during any period of incarceration.

With respect to this provision, **Participation** shall include promoting, inciting, conspiring to promote or incite, aiding, abetting, and all forms of taking part in, but shall not include actions taken in defense of public or private property, or actions taken in defense of the Employee, if such actions of defense are not taken against persons seeking to maintain or restore law and order including, but not limited to police officers and fire fighters.

With respect to this provision, **Riot** shall include all forms of public violence, disorder or disturbance of the public peace, by three or more persons assembled together, whether or not acting with a common intent and whether or not damage to persons or property or unlawful act or acts is the intent or the consequence of such disorder.

### Disability Benefit Exclusions

A Weekly Benefit will not be payable if an Employee becomes Disabled due to:

1. Injury that arises out of or in the course of employment; or
2. Sickness when a benefit is payable under a Workers' Compensation Law, or any other act or law of like intent.

These exceptions will not apply to partners or proprietors who elect not to be covered under such laws.

# SECTION 6 - TERMINATION

**Termination of an Employee's Benefits**

An Employee will cease to be a participant on the earliest of the following dates:

1. the date this Plan terminates, but without prejudice to any claim originating prior to the time of termination;

2. the date the Employee is no longer in an eligible class;

3. the date the Employee's class is no longer included for benefits;

4. the date employment terminates. Cessation of Active Employment will be deemed termination of employment, except the benefits will be continued for an Employee absent due to Disability during the Elimination Period.

5. the date the Employee ceases active work due to a labor dispute, including any strike, work slowdown, or lockout.

# SECTION 7 - GENERAL PROVISIONS

**Assignment**

No assignment of any present or future right or benefit under this Plan will be allowed.

1. This Plan may be changed in whole or in part. Only an officer of the Company can approve a change. The approval must be in writing and endorsed on or attached to this Plan.

2. No other person, including an agent, may change this Plan or waive any part of it.

**Employee's Booklet**

The Company will provide a Booklet for delivery to each Employee. It will state:

1. the name of the Plan Administrator and the Plan number;
2. a description of the benefits provided;
3. the method used to determine the amount of benefits;
4. to whom benefits are payable;
5. limitations or reductions that may apply;
6. the circumstances under which benefits terminates; and
7. the rights of the Employee upon termination of this Plan.

If the terms of a Booklet and this Plan differ, this Plan will govern.

**Examination**

The Plan may have the right and opportunity to have an Employee, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by the Plan. This right may be used as often as reasonably required.

**Legal Proceedings**

A claimant or the claimant's authorized representative cannot start any legal action:

1. until 60 days after Proof of claim has been given; or

2. more than one year after the time Proof of claim is required.

**Notice and Proof of Claim**

1. **Notice**

   a. Notice of claim must be given to the Plan within 30 days of the date of the loss on which the claim is based. If that is not possible, Lincoln, on behalf of the Company, must be notified as soon as it is reasonably possible to do so. Such notice of claim must be received in a form or format satisfactory to the Plan.

   b. When written notice of claim is applicable and has been received by the Plan the Employee will be sent claim forms. If the forms are not received within 15 days after written notice of claim is sent, the Employee can send to the Plan written Proof of claim without waiting for the forms.

2. **Proof**

   a. Satisfactory Proof of loss must be given to the Plan, no later than 30 days after the end of the Elimination Period.

b. Failure to furnish such Proof within such time shall not invalidate or reduce any claim if it was not reasonably possible to furnish such Proof within such time. Such Proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time Proof is otherwise required.

c. Proof of continued loss, continued Disability or Partial Disability, when applicable, and Regular Attendance of a Physician must be given to the Plan within 30 days of the request for such Proof.

The Plan reserves the right to determine if the Employee's Proof of loss is satisfactory.

**Right of Recovery**

The Company has the right to recover any overpayment of benefits caused by, but not limited to, the following:

1. fraud;
2. any error made by the Company in processing a claim; or
3. the Employee's receipt of any Other Income Benefits.

The Company may recover an overpayment by, but not limited to, the following:

1. requesting a lump sum payment of the overpaid amount;
2. reducing any benefits payable under this Plan;
3. taking any appropriate collection activity available including any legal action needed; and
4. placing a lien, if not prohibited by law, in the amount of the overpayment on the proceeds of any Other Income Benefits, whether on a periodic or lump sum basis.

It is required that full reimbursement be made to the Plan.

**Subrogation and Reimbursement**

When an Employee's Injury appears to be someone else's fault, benefits otherwise payable under this Plan for loss of time as a result of that Injury will not be paid unless the Employee or his legal representative agree(s):

1. to repay the Plan, for such benefits to the extent they are for losses for which compensation is paid to the Employee by or on behalf of the person at fault;

2. to allow the Plan, a lien on such compensation and to hold such compensation in trust for the Plan; and

3. to execute and give to the Plan, any instruments needed to secure the rights under 1. and 2. above.

Further, when the Company has paid benefits to or on behalf of the injured Employee, the Company will be subrogated to all rights of recovery that the Employee has against the person at fault. These subrogation rights will extend only to recovery of the amount the Company has paid. The Employee must execute and deliver any instruments needed and do whatever else is necessary to secure those rights to the Plan.

**Workers' Compensation**

This Plan and the benefits provided are not in lieu of, nor will they affect any requirements for coverage under any Workers' Compensation Law or other similar law.

# ANNEX B
# of
# ADMINISTRATIVE SERVICES ONLY AGREEMENT

Administrative Services to be furnished by Lincoln and certain obligations of the Sponsor in connection with the Benefit Plan described in Annex A of the Agreement and referred to as the Plan.

**I. Claims Services to be furnished on behalf of the Sponsor's self-insured Plan with respect to those classes of individuals for which Lincoln will make claim payments as agreed by Lincoln and the Sponsor.**

**A. Claims Payments and Control** - While the Agreement is in effect, Lincoln will accept, for processing and payment or denial, all claims for benefits under the Plan for which proof of claim is furnished in a form or format satisfactory to Lincoln.

1. Determination of Eligibility - When forwarding the claim to Lincoln for review, the Sponsor will furnish to Lincoln, in a form or format satisfactory to Lincoln, information identifying by name the persons then participating under the Plan, the effective dates of their participation, and the extent of their participation in the Plan. Lincoln will rely on the information furnished to it by the Sponsor; and the Sponsor will hold Lincoln harmless for any inaccuracy in such information.

2. Claims Processing - The Sponsor must notify Lincoln in a format satisfactory to Lincoln when notice of claim for disability benefits is received. The notice must be provided at approximately the mid-point of the elimination period. Such notice will:

   1. identify the Sponsor; and
   2. contain other information regarding the:

      a. time of disability;
      b. place of disability;
      c. circumstances of disability;
      d. nature of disability; and
      e. name and address of the employee.

   Lincoln will review each new claim within 3 business days of receipt, and the claim will be approved, pended or denied. If sufficient information is not provided to Lincoln to make a claim determination (approval or denial), Lincoln will contact the appropriate party (employer, employee and/or physician) no later than 3 business days (from the claim receipt date) to request the information necessary to complete its review.

**ANNEX B**
**of**
**ADMINISTRATIVE SERVICES ONLY AGREEMENT**
(Continued)

During the term of this Agreement Lincoln will:

1. review and investigate all claims with a duration equal to or greater than the elimination period for the Plan shown in Annex A to establish whether benefits are payable to the claimant under the terms of the Plan; and

2. determine whether benefit payments should continue, whether an independent medical examination should be given, or whether a referral to rehabilitation services should occur.

Where no benefit is payable because of an exclusion or limitation of the Plan, or because the claimant is not eligible for benefits under the Plan, Lincoln will notify the Sponsor and claimant in writing of the rejection of the claim.

In the event that the Sponsor determines that Lincoln has misinterpreted the Plan and so informs Lincoln in writing, all claims reported after delivery of such writing will be processed and paid in accordance with the Sponsor's interpretation as set forth in such writing. Provided, however, that unless Lincoln specifically agrees in writing the Sponsor's interpretation will not be binding regarding any insurance policy Lincoln or its parents or affiliates issued.

If Lincoln, upon the advice of its legal counsel, determines that the Sponsor's interpretation would cause Lincoln to violate applicable law, Lincoln will so inform the Sponsor and will not take any action to implement the Sponsor's interpretation until Lincoln is satisfied with the legality of the Sponsor's interpretation.

All doubtful claims will be referred to the Sponsor for its determination of liability.

3. Claims Control - Lincoln may investigate any claim and/or request that the claimant be examined at any point during the life of the claim. In addition, Lincoln will take such steps as may be necessary to give effect to any integration or benefit offset provisions of the Plan.

## ANNEX B
## of
## ADMINISTRATIVE SERVICES ONLY AGREEMENT
(Continued)

4. Payment of Claims - Whenever Lincoln determines a benefit to be payable under the Plan, Lincoln will prepare a draft on the funds of the Sponsor for the amount of payment and forward that draft to the covered employee or, if applicable, the employee's assignee, unless the Sponsor directs otherwise.

   Lincoln will be responsible for:

   a. verifying drafts' authorized signatures and ascertaining the completeness and regularity of endorsements under Uniform Commercial Code standards;
   b. verifying drafts' amounts and payees as issued; and
   c. producing all reports that will be mutually agreed upon.

   Notwithstanding the provisions of Subpart Three D. in the Agreement, with respect to any review of drafts agreed to by Lincoln under this Subpart, Lincoln agrees to bear any loss sustained by the Sponsor caused solely by the negligent acts or omissions of Lincoln. The Sponsor agrees to reimburse Lincoln for any benefit payments that Lincoln may make in good faith on the Sponsor's behalf, within 24 hours of receipt of the Funding Report.

5. Claims Review - The Sponsor will establish a procedure for reviewing disputed claims and any requests from claimants for a review of rejected claims. Lincoln will provide the Sponsor with advice on any such claims. The Sponsor will make the determination as to the final disposition of any ERISA appeals on claims that were denied or terminated by Lincoln. The appeal procedures will be outlined in the denial letter provided to the employee. The employee will have 180 days from the date of the denial letter to submit an appeal. The appeal must be in writing (from the employee or their legal representative) and contain additional information to support the claim.

   For claims for which Lincoln has agreed to provide appeal services in connection with reviewing denied claims, Lincoln shall review denied claims and review disputed claims and any requests from claimants for a review of rejected claims according to procedures established by the Sponsor. The employee will have 180 days from the date of the denial letter to submit an appeal. The appeal must be in writing (from the employee or their legal representative) and contain certain additional information to support the claim. In the event Lincoln recommends upholding the denial, Lincoln will notify the Sponsor of its findings in writing and provide the Sponsor with documentation reviewed in making its recommendation.

# ANNEX B
# of
# ADMINISTRATIVE SERVICES ONLY AGREEMENT
(Continued)

## II. Other Services To Be Furnished In Connection With The Plan

### A. Cost Analysis

At the Sponsor's request and subject to Lincoln's right to impose an additional charge, Lincoln will furnish the Sponsor with an estimate of the benefit cost of any proposed modification or extension of the Sponsor's Benefit Plan described in Annex A. In connection therewith, Lincoln will notify the Sponsor of any change in the Schedule of Charges under the Agreement which would be required if the Plan were so modified or extended.

### B. Materials to be Furnished

Upon request, Lincoln may furnish the Sponsor with a supply of Lincoln's standard forms to be used for submission of claims for benefits under the Plan, together with instructions for their use.

### C. Administrative Services - Managed Care Services and Other Services

Lincoln will make the following support services available and will be utilized if the Sponsor agrees to have such services provided to complement the Sponsor's self-funded program.

**Nurse Case Management (including but not limited to)**

- Medical Intervention - Utilizing nurses (R.N.'s) in the Managed Disability Services Unit. The nurse contacts the disabled employee, medical provider and employer/Sponsor and assesses the extent of disability and level of care being administered. Where appropriate, the R. N. may refer the employee to quality medical providers or services, then follows up regularly with the employee, employer, claim analyst and provider to review medical progress and help coach and promote the early return-to-work.

**Medical (including but not limited to)**

- Independent Medical Examination (IME) - Examination conducted by professionals of the same or different discipline as the employee's physician or provider. Includes review of medical records, x-ray films, MRI's, CT's and physical examination of the employee. It may include recommendations for additional testing to differentiate diagnosis or further evaluate treatment plans. No conversation takes place between examining physician and treating physician. No follow up treatment from the examining physician.

- Peer Review - Comprehensive review of the employee's medical records performed by a professional in the same discipline as the provider. Does not include physical examination of the employee. Usually involves conversation between the reviewer and treating provider about the treatment plan.

**ANNEX B**
**of**
**ADMINISTRATIVE SERVICES ONLY AGREEMENT**
(Continued)

- Second Opinion - Examination conducted by professionals of the same or different discipline as the employees physician or provider. Includes review of medical records, x-ray films, MRI's, CT's and physical examination of the employee. It may include recommendations for additional testing to differentiate diagnosis or further evaluate treatment plans. No conversation takes place between examining physician and treating physician. Could have follow up treatment with examining physician.

- Functional Capacity Evaluation (FCE) - A physical or occupational therapist performs an objective assessment of an employee's functional levels and physical capabilities. Used to determine level of work capability. Evaluations can be performed at the work site or at a therapy office.

- Independent Psychological Examination (IPE) - Psychological examination conducted by psychologist or psychiatrist. Includes review of medical records and in person evaluation of the employee. It may include recommendations for additional testing to differentiate diagnosis or further evaluate treatment plans. This does not include contact between the treating professional and the examining professional, and there is no follow up treatment from the examining professional.

- Additional Medical Testing and Treatment - Diagnostic testing and treatment related to recommendations from IPE's, IME's or Second Opinion, other diagnostic testing and treatment, lab work, imaging studies (X-rays), therapies, medications, prostheses, medical supplies and physical therapy.

- Medical Records - Medical records contain useful information such as office notes, detailed treatment plans and test results. These are often requested by the claim analyst or RN case manager when assessing overall disability and determining the best claim management course.

**Vocational Case Management (including but not limited to)**

- Vocational Assessment - A comprehensive analysis of employability, which takes into consideration medical status, vocational status, labor market information and earning capacity.

- Transferable Skills Analysis (TSA) - An analysis of the employee's work experience and education, along with restrictions and limitations, to determine other occupations which he or she is reasonably qualified.

- Labor Market Survey (LMS) - The study of a particular labor market to determine if employment opportunities exist in that geographic location. May include analysis of the growth and or decline in the number of jobs and wage data.

## ANNEX B
## of
## ADMINISTRATIVE SERVICES ONLY AGREEMENT
(Continued)

- Job Task Analysis - Vocational Rehabilitation Specialist assists in defining the essential and nonessential physical/cognitive duties of the specified job as it is performed during a traditional 8 hour work day.

- Vocational Evaluation/Testing - Objective testing of the employee's aptitudes, interests, values and attitudes.

- Vocational Exploration/Counseling/Planning - Using the information gathered during Vocational Assessment and Vocational Evaluation/Testing, the Vocational Rehabilitation Counselor proceeds to discuss options for returning to work. This counseling process is used to identify the best vocational alternatives given the employee's medical status, work and education history (skills), financial status, etc.

- Job Placement Assistance- These are activities to assist the employee with obtaining a new job. This may include identifying job openings, arranging interviews, preparing resumes and cover letters, teaching interview skills, etc.

- Ergonomic Assessment - Customize work station to best ergonomic fit for the employee's specific body structure and/or for specific impairments resulting from their disability. This may include adjusting desk top height, computer monitor height, keyboard, mouse pads and/or include adaptive equipment and technology, and analysis of the entire work environment for the employee.

**Investigation Services (including but not limited to)**

- Professional Investigation Services - Professional Investigation services typically include activities check, records check and /or surveillance. These investigations are only initiated when the information provided is inadequate or questionable, and the investigation is necessary to resolve.

- Disability Evaluation Interview - In person interview with the employee conducted by a professional investigator to obtain information on the employee's activities and to assess their lifestyle to provide further analysis of the disability.

**ANNEX B**
**of**
**ADMINISTRATIVE SERVICES ONLY AGREEMENT**
(Continued)

**III. Reports**

Lincoln will provide the following reports at no additional cost to the Sponsor:

1. Funding Report (Monthly, unless issuance of benefits is more frequent)

# ANNEX C
# of
# ADMINISTRATIVE SERVICES ONLY AGREEMENT

## SCHEDULE of CHARGES

**I. Administrative Service Only Charges**

The monthly expense charge for the Administrative Services provided under the Agreement for each of the 12 months beginning on **July 01, 2018** and ending on **June 30, 2019** and for succeeding 12 month periods will be determined as follows:

For Administrative Services Charges:

A. Number of Employees covered under the Plan X monthly Per Employee Rate

Monthly per Employee Rate: $ 2.845

The actual monthly Employee exposure is the actual total number of Employees in Active Employment covered under the Plan as of the first day of the month.

**Note:** While this Agreement remains in effect, the rates shall not be increased for the 36 month period beginning on the Effective Date of this Agreement except as permitted under Part Four B of the Administrative Services Only Agreement.

**AMENDMENT NO. 1**

It is agreed the following changes are hereby made to this Agreement: **PD3-840-445197-01**

Effective date of this Amendment: October 1, 2018

The attached Plan Summary reflects the following revision(s):

| **Changed the definition of Basic Weekly Earnings in Section 2** |
|---|

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This Agreement's terms and provisions will apply other than as stated in this amendment.

Dated this 26th day of November, 2018.

Issued to and Accepted by:

Centene Management Company
**Sponsor**

By________________________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

SECRETARY

AMENDMENT NO. 2

It is agreed the following changes are hereby made to this Agreement: **PD3-840-445197-01**

Effective date of this Amendment: January 1, 2020

The attached Plan Summary reflects the following revision(s):

**Added Class 2, All full-time SPA Employees" to the plan.**

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This Agreement's terms and provisions will apply other than as stated in this amendment.

Dated this 19th day of February, 2020.

Issued to and Accepted by:

Centene Management Company
**Sponsor**

By________________________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

SECRETARY

**AMENDMENT NO. 3**

It is agreed the following changes are hereby made to this Agreement: **PD3-840-445197-01**

Effective date of this Amendment: August 14, 2020

The attached Plan Summary reflects the following revision(s):

| |
|---|
| **Removed Class 2, "All full-time SPA Employees", from the plan. Changed description of Eligible Employees for Class 1 to removed reference to excluding SPA Employees.** |

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This Agreement's terms and provisions will apply other than as stated in this amendment.

Dated this 14th day of October, 2020.

Issued to and Accepted by:

Centene Management Company
**Sponsor**

By______________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

SECRETARY

**AMENDMENT NO. 4**

It is agreed the following changes are hereby made to this Agreement: **PD3-840-445197-01**

Effective date of this Amendment: July 1, 2018

The attached Plan Summary reflects the following revision(s):

**Changed the definition of Other Income Earnings in Section 4 to exclude severance.**

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This Agreement's terms and provisions will apply other than as stated in this amendment.

Dated this 25th day of March, 2021.

Issued to and Accepted by:a

Centene Management Company
**Sponsor**

By______________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

SECRETARY

AMENDMENT NO. 5

It is agreed the following changes are hereby made to this Agreement: **PD3-840-445197-01**

Effective date of this Amendment: January 1, 2023

The attached Plan Summary reflects the following revision(s):

| |
|---|
| **Changed the Amount of Insurance in Section 1 to include maternity benefits and to remove the Maximum Weekly Benefit.** |

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This Agreement's terms and provisions will apply other than as stated in this amendment.

Dated this 19th day of Janaury, 2023.

Issued to and Accepted by:

Centene Management Company
**Sponsor**

By________________________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

SECRETARY

**AMENDMENT NO. 6**

It is agreed the following changes are hereby made to this Agreement: **PD3-840-445197-01**

Effective date of this Amendment: July 10, 2020

The attached Plan Summary reflects the following revision(s):

| |
|---|
| **Added an Associated Company in Section 1.** |

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This Agreement's terms and provisions will apply other than as stated in this amendment.

Dated this 4th day of April, 2023.

Issued to and Accepted by:

Centene Management Company
**Sponsor**

By________________________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

SECRETARY

**AMENDMENT NO. 7**

It is agreed the following changes are hereby made to this Agreement: **PD3-840-445197-01**

Effective date of this Amendment: March 13, 2023

The attached Plan Summary reflects the following revision(s):

| |
|---|
| **Removed Associated Companies in Section 1.** |

The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.

This Agreement's terms and provisions will apply other than as stated in this amendment.

Dated this 13th day of April, 2023.

Issued to and Accepted by:

Centene Management Company
**Sponsor**

By______________________________________
**Signature and Title of Officer**

**Liberty Life Assurance Company of Boston**

SECRETARY